been no attachment of the four-sixteenths, the lien would have continued and been enforced against that part, notwithstanding the conveyance of the twelve-sixteenths, is a question which I have no occasion to consider.

It is urged by the libellant, that the lien must be regarded as continuing, until the vessel has returned to the port where the supplies were furnished. This is not so. She might never return there, and thus the lien would continue indefinitely. [As to all that portion of this vessel which has been conveyed, the lien is lost. As to that portion which has not been conveyed, the rights of attaching creditors are to be protected. It may be they will not maintain their actions. This can only be ascertained by the judgments of the courts in which the suits are pending. If the libellant elects to retain possession of the five-sixteenths to await the result of these suits, he can do so.] [2] Libel dismissed.

NOTE. See The Chusan [Cases Nos. 2,716, 2,717]; The Eliza Jane [Case No. 4,363]; The Antarctic [Id. 479]; The Utility [Id. 16,806]; The Romp [Id. 12,030]; The Canton [Id. 2,388]; Stillman v. The Buckeye State [Id. 13,445]; 1 Pars. Mar. Law, 433, note 2; 2 Pars. Mar. Law, 664, note 2.

---

LILLIE MILLS. The (ROBINSON v.). See Case No. 11,958.

LIMANTOUR (UNITED STATES v.). See Case No. 15,601.

LIMINGTON (BARRELL v.). See Case No. 1,040.

LINCK (FOOTE v.). See Case No. 4,913.

---

## Case No. 8,353.

In re LINCOLN et al.

[7 N. B. R. 334; [1] 20 Pittsb. Leg. J. 1; 3 Pittsb. Rep. 440.]

District Court, W. D. Pennsylvania. Aug. 12, 1872.

BANKRUPTCY—DISCHARGE—PROPERTY WORTH FIFTY PER CENT.

A bankrupt, who has otherwise conformed to the requirements of the bankrupt law [of 1867 (14 Stat. 517)], is entitled to his discharge if, at the time he filed his petition in bankruptcy, he was possessed of property fairly worth fifty per cent. of the debts proved against his estate, upon which he was liable as principal debtor. The fact that the property was sold below what it was actually worth, should not prejudice his right to a discharge, for the reason, that, after the appointment of an assignee, the bankrupt had no further control over the property, or its disposal, all of which was left to the skill and discretion of the assignee.

[Cited in Re Taggert, Case No. 13,725; Re Waggoner, 5 Fed. 917.]

---

[2] [From 18 Law Rep. 494.]

[1] [Reprinted from 7 N. B. R. 334, by permission.]

By SAMUEL HARPER, Register:

Alexander Cherry one of the bankrupts, has petitioned for his discharge. None of the creditors appeared in opposition. All of the debts proved were contracted subsequently to January 1st, 1869. No assent of creditors to the discharge has been filed, and the bankrupt's right to his certificate depends upon a sufficiency of assets. The whole amount of money actually coming into the hands of the assignee is $1,180.50. The total amount of debts proved is $2,640.15. If the word "assets" in the 33d section of the bankrupt law means, as some contend, money actually realized, it would require $1,320.08 to entitle the bankrupt to a certificate, and in this matter the certificate would have to be refused. I do not think that so restricted a construction should be placed upon the word. A bankrupt should have the full benefit of his property when he seeks a discharge, and ought not to be made the victim of circumstances over which he has had no control. When he files his petition he may be possessed of ample property to pay fifty per cent. of all his liabilities, but before there is time to sell and realize, many circumstances may happen resulting in depreciation and loss. Between the filing of the petition and a sale by an assignee, a considerable period must elapse, during which a commercial panic may occur, resulting in serious loss to the estate; or a fire may destroy or so seriously damage the property as to reduce the amount of money realized by the assignee below the requisite fifty per cent. The property may be in the stock of incorporated companies, and whilst it is in the hands of the assignee may become of greatly less value, or entirely worthless. Before the passage of the bankrupt law an insolvent debtor had a right to make such disposition of his property for the benefit of his creditors as he pleased. But this right is taken away, and his safety lies only in filing a petition in bankruptcy. This course necessarily results in delays. A stock of merchandise will generally command better prices before the business is closed than it will afterwards. Now, if the bankrupt possesses property fairly worth one-half of his liabilities when he files his petition, it seems unreasonable to deny him the advantages of a law designed for his relief, because, for causes over which he has no control, a less amount of money should be realized.

There is still another important consideration in this matter. In the appointment of an assignee the bankrupt has no voice—that belongs entirely to the creditors or the court, as the case may be. It is true that neither the creditors or the court will select, knowingly, an incompetent assignee; but still results do sometimes show that improper appointments have been made, and that serious losses have thereby occurred. I think it would do violence to the spirit and intent of

the bankruptcy system, to say that the bankrupt should be held responsible, and suffer the penalty, in the case of an incompetent, dishonest or corrupt assignee, over whose appointment and in whose management he had no control. Where the bankrupt has acted in good faith, and performed his duty under the bankrupt law, I am of opinion that he should have his certificate, if, at the time he filed his petition, he was possessed of property fairly worth one-half of the debts proved against his estate, upon which he was liable as principal debtor. In this matter, the property consisted of a stock of watches, clocks, jewelry, and plate—standard articles, whose value could be correctly appraised by any one in the trade. The bankrupt testifies that when he filed his petition he took an inventory of stock, and that it amounted to between $3,000 and $3,500; that all of the goods were delivered to his assignee; that they could not have been bought for cash for less than $2,500; that a majority of them were first-class in manufacture, material and finish; that he assisted the auctioneer at the sale; that the goods sold greatly below their actual cost value—some fully fifty per cent. below, and others were almost given away; and that the goods were bought at low prices, principally by himself. This testimony is corroborated by Cummings Cherry, Jr., a brother of the bankrupt, who was book-keeper for the firm. The assignee also testifies, from his knowledge of the goods, that they realized on an average about fifty per cent. of cost price. There is no reason given for this considerable loss; and though I might conjecture one, it is unnecessary, so long as there is no shadow of reason for holding the bankrupt culpable. Nor does any blame attach to the assignee, for he is a merchant of this city signalized for his personal integrity. and his energy and success in business. It was because he possessed such qualities that he was selected by the creditors. I am aware it required much persuasion to induce him to accept the appointment, urging, as he did, his want of knowledge of the trade in which the bankrupts were engaged. In that view I entirely concur; for I think there can be no doubt that the best results can be obtained by those best acquainted with the business, and that creditors are generally blind to their own interests when they select an assignee who has no knowledge, or little if any, of the bankrupt's trade. Entertaining the views I have hinted at, more than expressed, and carefully considering all the facts, I have no hesitation in making the accompanying certificate of conformity recommending that Alexander Cherry, one of the bankrupts be discharged.

McCANDLESS, District Judge. Opinion of the register approved, and discharge of the bankrupt ordered.

## Case No. 8,354.

### The LINCOLN.

[1 Lowell, 46.] [1]

District Court, D. Massachusetts. Jan., 1866.

COLLISION—VESSEL AT ANCHOR — PRESUMPTION— PRUDENT AND SAFE POSITION—WATCH.

1. When one vessel drives upon another, which is at anchor in a proper position, the presumption is that the former is in fault.
[Cited in The Echo, 19 Fed. 454.]

2. It cannot be affirmed, as matter of law, that a vessel, coming to anchor in a harbor, is only obliged to swing clear of other vessels already anchored there. She is bound, if possible, to take up such a position as is prudent and safe under all the circumstances.

3. Where a brig was brought to anchor in the daytime, when the wind was blowing heavily and seemed likely to increase, ten fathoms astern of one schooner, and twenty fathoms ahead of another, and had out, when so anchored, only half the scope of her chains, and, during the night, the schooner ahead fouled the brig, which dragged on the schooner astern: *Held*, the brig was responsible to the latter schooner, whether she was at all in fault for the first collision or not, because she was anchored too near the schooner astern.

4. Semble, she was too near the other schooner also.

5. The injured schooner should have had an anchor watch: but as the neglect to keep one did not contribute to the collision, she was decreed to recover her whole damage.

In admiralty.

H. A. Scudder, for libellants.
J. C. Dodge, for respondents

LOWELL, District Judge. This is a cause of collision promoted by the owners of the Annie Magee, a schooner of two hundred and twenty tons burden, against the Lincoln, a brig of one hundred and ninety tons, for the consequences of a collision which occurred in the harbor of Boston on the night of the second of November, 1861. The pleadings were filed, and some of the evidence was taken soon after the event happened; but the hearing was, for some reason, not brought on until lately.

The libellants' schooner, having discharged a cargo of coal in Boston, took up her anchorage towards noon, on the edge of the flats, from half a mile to a mile to the southward and eastward of Long wharf, and about half way between two schooners already lying there, of which the only one we are concerned with in this case, the Eliza & Rebecca, was directly to windward. The wind was blowing fresh from the east-south-east, and seemed likely, as all the witnesses say, to increase. It did, in fact, increase during the afternoon, and some part of the night, until it was blowing very heavily.

An hour or two after the schooner came to anchor, the brig, with a load of coal on

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]